UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br> vs.<br><br>GRANT BLACKSMITH,<br><br>    Defendant. | 5:17-CR-50160-JLV<br><br>REPORT AND RECOMMENDATION |

Pending is Defendant's Motion to Suppress (Doc. 30). A hearing was held on Tuesday, June 12, 2018. Defendant was personally present and represented by his attorney of record, Assistant Federal Public Defender Thomas Diggins. The Government was represented by the Assistant United States Attorney Megan Poppen. Three witnesses testified at the hearing. Ten exhibits were received into evidence. Post-hearing briefing concluded on September 11, 2018. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

### **RECOMMENDATION**

It is respectfully recommended that Defendant's Motion to Suppress be denied.

## JURISDICTION

Defendant is charged in an Indictment with Aggravated Sexual Abuse by Force, in violation of 18 U.S.C. §§ 1153, 2241(a)(1), 2241(c), and 2246(2)(A), and Aggravated Sexual Abuse, in violation of 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(D). The pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's Standing Order dated April 1, 2018.

## FACTUAL BACKGROUND

In early 2016, FBI Special Agent ("SA") Matt Thatcher spoke with a minor female, T.T., about allegations of sexual abuse against Defendant Grant Blacksmith. (Doc. 55 at p. 3–4). T.T. alleged that in approximately 2005, when she was seven or eight years old, Mr. Blacksmith sexually assaulted her while she was living with her father in Oglala, South Dakota. (Id.). T.T. stated that the assault occurred during a party at her father's house: Mr. Blacksmith approached her, made her touch his penis, and then took off her clothes and penetrated her vagina with his penis. (Doc. 39 at p. 1–2). SA Thatcher testified at the evidentiary hearing, and the court finds his testimony credible.

In March 2016, SA Thatcher spoke with Mr. Blacksmith at the Oglala Recreation Center, where he was residing at the time. (Doc. 55 at p. 6). SA Thatcher was wearing casual clothing with his weapon out of sight. (Id. at p. 7). SA Thatcher described T.T.'s allegations to Mr. Blacksmith, and Mr. Blacksmith denied the alleged assault. (Id. at p. 10). SA Thatcher then offered Mr. Blacksmith the option of taking a polygraph test. Mr. Blacksmith

said he would like to do so, and told SA Thatcher how to contact him for future meetings. (Id.). Their meeting lasted approximately 30–45 minutes. (Id. at p. 11).

SA Thatcher followed up with Mr. Blacksmith in June 2017, and he again stated he was interested in taking a polygraph. (Id.). SA Thatcher arranged an appointment with an FBI polygrapher, SA Tim Wittman, for July 10, 2017. Between June and July, SA Thatcher unsuccessfully attempted to get ahold of Mr. Blacksmith and inform him about the July 10 polygraph. At approximately 9:30 a.m. on July 10, 2017, SA Thatcher spoke with Mr. Blacksmith at his mother's residence in Oglala and asked whether he was willing to take the polygraph that day. Mr. Blacksmith said he was willing to take the polygraph. However, he qualified that he was very tired because he had stayed up all night watching for vandals and was also concerned that he did not have a babysitter to watch his daughter. SA Thatcher told Mr. Blacksmith it was his decision to take the test, and he did not have to take it if he did not want to. Mr. Blacksmith conferred with his mother and sister in the house, and then agreed to leave with SA Thatcher to take the polygraph in Pine Ridge. (Id. at p. 14–17). Mr. Blacksmith was not restrained during the drive to Pine Ridge, and SA Thatcher did not display his gun or badge. SA Thatcher took a direct, twenty-minute route to Pine Ridge. At no point during the drive did Mr. Blacksmith change his mind or ask to turn around. (Id. at p. 17–18).

The polygraph took place in the Pine Ridge Department of Social Services building, in a room measuring approximately 10 feet by 12 feet, which was large enough to hold a table and several chairs. (Id. at p. 21, 149). SA Thatcher introduced Mr. Blacksmith to SA Wittman, who was present to administer the polygraph. At approximately 10:30 a.m., before asking any questions or beginning the polygraph, the agents advised Mr. Blacksmith of his Miranda rights, and Mr. Blacksmith signed a standard FBI advice of rights form. (Ex. 2). SA Thatcher then left the room, and SA Wittman introduced himself, explained the polygraph process, and obtained Mr. Blacksmith's signed consent to conduct the polygraph interview after reading the consent form out loud. (Doc. 55 at p. 68; Ex. 3). The consent form contained an advice of rights, including the right to terminate the interview at any time, and stated "I voluntarily agree to be examined by means of the polygraph during this interview. I understand and know what I am doing. No threats or promises have been used against me to obtain my consent to the use of the polygraph." (Ex. 3). SA Thatcher could not recall whether he kept Mr. Blacksmith's cell phone during the interview.[1] (Doc. 55 at p. 48).

SA Wittman testified at the evidentiary hearing, and the court finds his testimony credible. SA Wittman did not wear his gun in the interview, and his badge was hidden. Mr. Blacksmith informed SA Wittman that he was tired

---

[1] SA Wittman testified that he did not recall whether or not Mr. Blacksmith had his cell phone, but that he instructs polygraph subjects to turn their phones off before commencing an interview. (Doc. 55 at p. 69, 90). Mr. Blacksmith testified that SA Thatcher instructed him to turn his cell phone off before the polygraph interview and leave it in a room next door. (Id. at p. 121).

4

from the night before, and SA Wittman asked if he felt awake and alert enough to focus on the questions. Mr. Blacksmith responded that he was. (Id. at p. 70). SA Wittman observed that Mr. Blacksmith appeared open and talkative, and noted nothing unusual about his demeanor. Mr. Blacksmith also informed SA Wittman that he had taken several college classes. (Id. at p. 71). SA Wittman testified that he felt Mr. Blacksmith understood everything that he was asked. (Id. at p. 70–72). Mr. Blacksmith testified that he was in the military from 1989 to 1991 and had experience dealing with the military police. (Id. at p. 145).

Throughout the polygraph test, Mr. Blacksmith denied having sexual contact with T.T. (Id. at p. 75). The polygraph test itself was not recorded, and lasted approximately one hour. (Id. at p. 68). After finishing the polygraph test, SA Wittman informed Mr. Blacksmith that the results indicated deception, and began a recorded post-polygraph interview. Mr. Blacksmith continued denying any sexual contact with T.T. (Ex. 102). Approximately one hour and twenty-six minutes into the post-polygraph interview, Mr. Blacksmith asked to use the bathroom. (Ex. 102 at 1:26:20). SA Thatcher and SA Wittman showed Mr. Blacksmith where the bathroom was, and then left him there, allowing him to find his own way back to the polygraph office. (Doc. 55 at p. 24, 76). A marked exit door with a window was located next to the bathroom. (Id. at p. 25). Mr. Blacksmith did in fact return to the polygraph office on his own. (Id.; Ex. 102 at 1:29:20). Mr. Blacksmith was very familiar with the DSS building

and its exits from prior unrelated business he previously transacted at DSS. (Doc. 55 at p. 155).

When Mr. Blacksmith returned, SA Wittman continued the interview. After approximately fifteen minutes, SA Wittman began gathering up his polygraph equipment. (Doc. 55 at p. 82; Ex. 102 at 1:44). After a long pause, Mr. Blacksmith stated, "Yeah, that's the only time [sexual contact occurred], I think." (Ex. 102 at 1:45). Mr. Blacksmith then proceeded to make incriminating statements. (Id. at 1:45–1:57). About ten minutes later, SA Thatcher entered the room, and Mr. Blacksmith repeated what he had said. (Id. at 1:57–2:00). The entire interview lasted approximately two hours. SA Wittman testified that he never told Mr. Blacksmith he could be charged with a crime; never stated the penalties for a sexual abuse charge; and did not make any promises or threats. (Doc. 55 at p. 78, 84–85). The recording shows that SA Wittman spoke in a quiet, slow manner throughout the interview. (Ex. 102).

SA Thatcher then asked Mr. Blacksmith if he had a friend or family member who could pick him up. (Doc. 55 at p. 29). Mr. Blacksmith said he did not, and SA Thatcher agreed to take him home. (Id.). Mr. Blacksmith asked to go to the Big Bat's store in Pine Ridge for food, so SA Thatcher drove there and waited in the car while Mr. Blacksmith made his purchase. (Id. at p. 29–30). Mr. Blacksmith returned to the car after buying his food, and the two departed for Oglala. (Id. at p. 30).

Along the drive, SA Thatcher conducted a recorded interview with Mr. Blacksmith about the allegations. (Ex. 103). Mr. Blacksmith made additional incriminating statements. (Id.; Doc. 55 at p. 31–34). After approximately thirty-three minutes, Mr. Blacksmith told SA Thatcher he wanted to speak with his pastor and he needed some time before talking to SA Thatcher again. (Ex. 103 at 33:00). SA Thatcher agreed and terminated the interview. (Id.). The entirety of the second interview lasted approximately thirty-four minutes. (Id.). Defendant returned to his home at approximately 3:00 p.m.; he had been absent for five to six hours. (Doc. 48 at p. 12).

Mr. Blacksmith testified at the June 12, 2018 evidentiary hearing. He testified that some of the agents' questions made him feel uncomfortable, and that SA Wittman touched his hand or arm several times during the interview, which made him "feel weird," but he agreed that both agents were respectful to him. (Doc. 55 at p. 131, 136, 160). Mr. Blacksmith testified that he was anxious about his daughter during the interview, and felt he could not leave because his cell phone was in the other room. (Id. at p. 156). However, he stated the agents were kind and patient, and he understood the questions they asked. (Id. at p. 160–61). Finally, he testified that he voluntarily chose to speak with the agents. (Id. at p. 161). In fact, Mr. Blacksmith testified that he wanted to take the polygraph test that day because he felt that he could pass it. (Id. at p. 145).

**DISCUSSION**

Mr. Blacksmith argues that his post-polygraph statements to SA Wittman and SA Thatcher were made involuntarily and should be suppressed. (Docs. 30, 53). In support of his argument, Mr. Blacksmith states he was exhausted during the interview, hungry, and felt concerned about his daughter's child-care situation, which impeded his mental functioning. Mr. Blacksmith further states he did not feel free to leave because the agents took his cell phone, he did not have a ride from the DSS building, no money for transit, and it would take him hours to walk home. Mr. Blacksmith points to a particular point in the post-polygraph interview where he claims he requested to be taken home, and states SA Wittman disregarded this request. These circumstances, according to Mr. Blacksmith, made him particularly susceptible to the agents' behavior.

Mr. Blacksmith also asserts that the agents behaved in a coercive manner. Mr. Blacksmith states that SA Wittman both minimized the allegations and maximized the weight of evidence against him, referenced religious morality, and repeatedly implied that Mr. Blacksmith was guilty; SA Thatcher continued the same techniques. Mr. Blacksmith further claims the total length of the interviews was excessive. Mr. Blacksmith argues that these combined factors overbore his will, rendering his statements involuntary.

"Due process requires that confessions be voluntary." United States v. Anaya, 715 F. Supp. 2d 916, 931 (D.S.D. 2010) (citing Brown v. Mississippi, 297 U.S. 278, 285–86 (1936)). "The appropriate test for determining the

8

voluntariness of a confession is 'whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will.'" United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990) (quoting United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989)).  A statement is voluntary if it is "the product of an essentially free and unconstrained choice by its maker."  Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973).  "On the other hand, a statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination."  LeBrun, 363 F.3d at 724.  The government bears the burden of showing by a preponderance of the evidence that the challenged statements were voluntary.  United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004).

When assessing whether the defendant's will was overborne, the court considers "the conduct of the officers and the characteristics of the accused."  LeBrun, 363 F.3d at 724.  Relevant factors include the defendant's prior experience with law enforcement; the nature of the interrogation, including its duration and location; whether the defendant was in custody or otherwise restrained; whether law enforcement employed hostile tactics; and defendant's intelligence and mental state.  See, e.g., id. at 726; United States v. Turner, 157 F.3d 552, 555–56 (8th Cir. 1998).

Low intelligence or impaired mental functioning are not determinative of voluntariness without some evidence of coercive police activity.  Colorado v. Connelly, 479 U.S. 157, 165 (1986) ("A statement rendered by [a mentally

9

incompetent individual] might be proved to be quite unreliable, but this is a matter to be governed by the evidentiary laws of the forum . . . and not by the Due Process Clause[.]"); Turner, 157 F.3d at 555 (finding confession voluntary where defendant "was clearly intelligent to understand his rights" even though he was intoxicated with PCP at time of confession and his IQ was in "low-average to borderline range").

Neither does the use of suggestive or deceptive questioning tactics render a confession involuntary unless "the overall impact of the interrogation caused the defendant's will to be overborne." United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005) (quoting Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993)); United States v. Makes Room For Them, 49 F.3d 410, 415 (8th Cir. 1995) (finding confession voluntary although defendant had eighth-grade education and below-average intelligence; officers' "suggestive" questions did not rise to requisite level of coercive activity because no threats or promises were made). Moreover, "[q]uestioning a suspect for six or seven hours is not unconstitutionally coercive per se." Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001).

"[O]fficers elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices." Brave Heart, 397 F.3d at 1041 (citing Astello, 241 F.3d at 967–68); see Simmons, 235 F.3d at 1132–33 (where three officers interrogated a 17–year–old habeas petitioner

10

with below-average intelligence for over two hours, raising their voices in close proximity, making misrepresentations, and "telling him things would go better for him if he told the truth," court found that habeas petitioner did not prove that his will was overborne by police); Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) (where officers interviewed habeas petitioner for six to seven hours, used questioning techniques that referenced a "bad Debbie" who was responsible, raised their voices, and accused defendant of not being honest, the court found that habeas petitioner did not prove that her will was overborne by police); United States v. Running, 698 F. Supp. 2d 1186, 1196 (D.S.D. 2009) (where agent was taller and heavier than defendant, did not counsel defendant he could later be arrested, and told defendant it would be dishonorable for a Native American Marine to force a young girl to go through court proceedings, defendant failed to show his will was overborne).

    The court finds first that Mr. Blacksmith's personal characteristics did not make him particularly vulnerable to the agents' conduct. Mr. Blacksmith was 51 years old at the time of the interview, with experience in both the tribal and military justice system. (Doc. 55 at p. 137–38, 145). Although Mr. Blacksmith claims his exhaustion, hunger, and child-care worries rendered his statements involuntary, the court finds otherwise. Mr. Blacksmith specifically informed SA Wittman that he was awake and alert enough to conduct the interview, and that he had someone to watch his daughter. (Id. at p. 70–71). Even if Mr. Blacksmith's exhaustion and preoccupations about his daughter did impair his mental functioning, that impairment was far less

severe than the incapacities analyzed in Turner and Makes Room For Them; there, despite mental impairments, the Eighth Circuit found that defendants' confessions were voluntary because defendants appeared intelligent enough to understand their rights. Here, Mr. Blacksmith signed two advice of rights forms, and SA Wittman observed that Mr. Blacksmith appeared to understand all questions. Furthermore, Mr. Blacksmith did not appear to have any mental incapacity; did not appear intoxicated; and informed SA Wittman that he had taken college courses. Mr. Blacksmith himself testified that he understood the agents' questions, wanted to take the polygraph test because he felt he could pass it, and voluntarily chose to speak with the agents. The court finds no indication that Mr. Blacksmith was particularly vulnerable to police behavior.

Even if Mr. Blacksmith's mental functioning was impaired, the court finds his statements were nevertheless voluntary because the agents did not behave in a coercive manner. See Connelly, 479 U.S. at 165. Neither agent displayed his weapon, raised his voice, or behaved in an intimidating manner. Both agents spoke in a respectful and cordial manner throughout the interviews, and Mr. Blacksmith admitted such. The court does not find SA Wittman's occasional touching of Mr. Blacksmith's arm and hand to be an impermissibly coercive tactic. Mr. Blacksmith was never handcuffed, and was specifically advised he could terminate the interview at any time. Mr. Blacksmith never requested to be taken home.[2] Significantly, he had

---

[2] Mr. Blacksmith argues, based on the transcript of the post-polygraph interview, that at minute marker 37:47 he asked SA Wittman to "take me back home," and his request was ignored. (Doc. 31-1 at p. 20). The court gives greater weight to the recorded interview than the

12

several opportunities to remove himself from the interviews: the agents left him unattended in the DSS bathroom, asked if he had someone else to pick him up from DSS, and sat in the car while he went into Big Bat's. Ultimately, while returning to Oglala, Mr. Blacksmith told SA Thatcher that he wanted to pray and speak with his pastor before continuing the conversation, and SA Thatcher terminated the interview.

Mr. Blacksmith argues that the agents used manipulative tactics by appealing to his religious morality and discussing his worth as a family member and as a man. The Eighth Circuit has held that these techniques are permissible. Brave Heart, 397 F.3d at 1041; see also Running, 698 F. Supp. 2d at 1196. The court further finds no evidence of impermissible threats or promises. See, e.g., Simmons, 235 F.3d at 1132–33 (officers permissibly told suspect "things would go better for him if he told the truth."). For these reasons, the government has met its burden to show that Mr. Blacksmith's statements were voluntarily given.

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that Mr. Blacksmith's motion to suppress be denied.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1),

---

transcript. In the recorded interview, Mr. Blacksmith described how his daughter's mother often picked him up from parties. (Ex. 102 at 37:00–38:00). At minute marker 37:47, he can be heard saying that his daughter's mom would take him back home. The court therefore finds that Mr. Blacksmith did not tell SA Wittman he wanted to be taken home.

unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 24th day of October, 2018.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge