UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>   vs.<br><br>GRANT BLACKSMITH,<br><br>               Defendant. | CR. 17-50160-JLV<br><br>ORDER |

## INTRODUCTION

On October 24, 2017, a grand jury indicted defendant Grant Blacksmith on one count of aggravated sexual abuse by force and one count of aggravated sexual abuse. (Docket 1). The charges originate in an incident occurring between 2005 and 2007 where defendant allegedly sexually assaulted T.T., a minor female child. Id. Now pending before the court is defendant's motion to suppress all statements he made to the Federal Bureau of Investigation ("FBI") agents following a polygraph examination on July 10, 2017. (Docket 30). The United States opposes this motion. (Docket 39).

The suppression motion was referred to Magistrate Judge Daneta Wollmann for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and the court's April 1, 2018, standing order. The magistrate judge conducted a hearing on the motion at which three witnesses testified and ten exhibits were received into evidence. (Dockets 41 & 42). The parties submitted post-hearing briefing. (Dockets 48 & 53). The magistrate judge then issued a report and

recommendation ("R&R") concluding defendant's motion should be denied. (Dockets 57).   Defendant timely filed objections to the R&R.   (Docket 60).

Under the Federal Magistrate Act, 28 U.S.C. § 636(b)(1), if a party files written objections to the magistrate judge's proposed findings and recommendations, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."   Id.   The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."   Id.

For the reasons given below, the court overrules defendant's objections to the R&R in part and sustains them in part.   The court accordingly modifies and adopts the R&R.   The court denies defendant's suppression motion.

**ANALYSIS**

**I.    Factual Findings**

The following factual recitation is derived from the R&R, the testimony at the evidentiary hearing before the magistrate judge, and the exhibits admitted in that hearing.

In early 2016, FBI Special Agent Matt Thatcher ("SA Thatcher") spoke with T.T., who alleged defendant sexually assaulted her in 2005 or 2006, when she was approximately seven or eight years old.   (Docket 55 at pp. 3-4).   Through "word of mouth," SA Thatcher located defendant living at the Recreation Center in Oglala, South Dakota, in March of 2016.   Id. at p. 4.   The Recreation

Center—also known as the Re*Creation & Worship Center[1]—is a facility in Oglala hosting "living quarters for adult men" operated by a Christian organization. <u>Id.</u> at p. 6. SA Thatcher spoke with defendant for 30-45 minutes at the Recreation Center and informed him of the allegations by T.T. <u>Id.</u> at pp. 8-9, 11. Defendant told SA Thatcher T.T. is the daughter of a good friend of his, Donroy Titus, and he had spoken to her "on multiple occasions." <u>Id.</u> at p. 8. At that time, defendant told SA Thatcher he did not remember assaulting T.T. and the allegations did not "seem like something he would do." <u>Id.</u> at p. 9. SA Thatcher offered defendant the option to take a polygraph examination and ended the interview. <u>Id.</u> at p. 10. Defendant does not seek to suppress any statements made to SA Thatcher during the March 2016 interview.

SA Thatcher contacted defendant again in June of 2017. <u>Id.</u> at p. 11. It is uncertain whether SA Thatcher recorded this conversation. <u>Id.</u> at pp. 57-58. The conversation was brief; SA Thatcher wanted to determine if defendant was still living in the Oglala area and whether he still wanted to take a polygraph test. <u>Id.</u> at p. 11. Defendant told SA Thatcher he was still interested in taking the polygraph and he was living with his mother and sister in the Belt Village neighborhood of Oglala. <u>Id.</u> Defendant did not give SA Thatcher a consistently active phone number or other reliable way to contact him. <u>Id.</u> at pp. 11-13.

SA Thatcher arranged for Special Agent Tim Wittman ("SA Wittman"), a trained polygraph examiner from the FBI's Minneapolis office, to come to Pine

---

[1]<u>See</u> Eric Sutton, <u>About us</u>, <u>http://oglalarwc.org/about-us.html</u> (last visited Jan. 17, 2019).

Ridge, South Dakota, on July 10, 2018, to administer polygraph tests.  Id. at pp. 12-13.  SA Thatcher attempted to contact defendant again between the June meeting and July 10 but was unsuccessful.  Id. at p. 13.  He retrieved the Belt Village address of defendant's sister from tribal records and went to that home on the morning of July 10 to locate defendant.[2]  Id. at pp. 13-14.  SA Thatcher wanted to ask defendant to take a polygraph test while SA Wittman was in Pine Ridge.  Id. at p. 14.

SA Thatcher arrived at defendant's sister's home in Belt Village between 9 and 10 a.m. and found defendant there.  Id.  He did not record the conversation with defendant.  Id.  Defendant told SA Thatcher he was willing to take the polygraph test that day, but he was tired because he had been awake during the night watching for vandals.  Id. at pp. 14-15.  Defendant slept approximately four or five hours that night.  Id. at p. 90.  Defendant was also concerned about childcare for his young daughter, who was in the home with him.  Id. at p. 15. SA Thatcher told defendant it was "not easy" to get a polygraph examiner to Pine Ridge.  Id.  SA Thatcher also told defendant the polygraph was voluntary and he did not have to take it that day.[3]  Id. at pp. 15-16.  Defendant's sister agreed to watch his daughter if he left to take the polygraph test.  Id. at

[2]Defendant testified the home where SA Thatcher met him on the morning of July 10 belonged to his sister.  (Docket 55 at p. 111).  His mother lived nearby, in the Oglala Housing neighborhood.  Id.

[3]Defendant contests this testimony.  (Docket 60 at p. 2).  He claims SA Thatcher only told him about the difficulty of getting a polygraph examiner to Pine Ridge and did not tell him the polygraph was voluntary.  (Docket 55 at p. 115).

pp. 115-16.   However, she planned to "do some business" in town during the day and defendant believed the other adult likely to be in the home during the day—his niece's husband, who would return home from work shortly after 11 a.m.—was unwilling to watch his daughter if his sister left the house.[4]   Id. at pp. 115-17.   Defendant nevertheless agreed to leave with SA Thatcher to take the polygraph test.   Id. at p. 117.   They did not discuss the allegations against defendant on the ride from Oglala to Pine Ridge.   Id.   SA Thatcher's gun and badge were not visible during the interview at the home or during the ride to Pine Ridge.   Id. at p. 17.

SA Thatcher took defendant to the South Dakota Department of Social Services ("DSS") building in Pine Ridge.   Id. at pp. 18-19.   He brought defendant into an office in that building he estimated to be approximately 10 by 12 feet in size.   Id. at p. 21.   SA Thatcher believed the office was of a size to be used by a single employee, such as a supervisor.   Id.   Defendant claims SA Thatcher asked him to leave his cell phone in this office.   Id. at p. 121.   SA Thatcher did not recall asking defendant to leave his cell phone or otherwise taking it from him.   Id. at p. 23.   He did testify, however, that he would have kept defendant's cell phone during the polygraph had defendant asked.   Id. Defendant signed two consent forms prior to the polygraph interview. Suppression Hearing Exs. 2 & 3.   The first, signed at 10:32 a.m. was an Advice

---

[4]SA Thatcher testified another adult female, who he believed to be defendant's mother, was in the home when he arrived.   (Docket 55 at p. 16). Defendant disagrees with this testimony; he testified his sister was the only other adult present.   Id. at pp. 116, 144.

of Rights form listing defendant's <u>Miranda</u>[5] rights, including the right to remain silent and the right to stop answering questions at any time.   Suppression Hearing Ex. 2.   The second form, signed at 10:35 a.m., was a polygraph consent form informing defendant of his right to refuse the test, to stop the test at any time and to refuse to answer any individual question.   Suppression Hearing Ex. 3.

Before administering the polygraph test, SA Wittman read the polygraph consent form out loud to defendant.   (Docket 55 at p. 69).   He was not wearing a gun and his badge was not visible.   <u>Id.</u>   He did not know whether defendant had a cell phone; however, he testified he instructs all test participants to make sure any cell phone is completely turned off.   <u>Id.</u>   Defendant told SA Wittman he was tired, having only had four or five hours of sleep, but that he was alert enough to focus on the test.   <u>Id.</u> at p. 70.   SA Wittman found defendant to be nervous, but not unusually so compared to other polygraph examinees.   <u>Id.</u> at p. 71.   SA Wittman attached polygraph "components"—the devices necessary for the test—to defendant's person, including a blood pressure cuff on one arm, two pneumograph tubes across his chest and two electrodermal activity plates on two of his fingers.   <u>Id.</u> at p. 92-93.   SA Wittman felt defendant understood all his questions during the test.   <u>Id.</u> at pp. 71-72.

The test indicated deception, in SA Wittman's opinion.   <u>Id.</u> at p. 74.   He told defendant it was "clear [he] did in fact have sexual contact" with T.T. (Docket 31-1 at p. 1).   Immediately following the end of the polygraph test, SA

---

[5]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

Wittman began interrogating defendant.   (Docket 55 at p. 74).   SA Wittman did not remove the polygraph components from defendant's person before beginning the interrogation.   Id. at p. 75.   SA Wittman recorded the interrogation and a transcript was made of this recording.   See Docket 31-1.

The post-polygraph interrogation lasted approximately two hours. Suppression Hearing Ex. 1.[6]   SA Wittman spoke in a level, ordinary tone of voice.   Id.; Docket 57 at p. 6.   SA Wittman repeatedly asked defendant if he forced T.T. to touch his penis or had vaginal sex with her, often accompanied with long colloquies referring to such incidents as a "one-time mistake" or "an accident."   See, e.g., Docket 31-1 at pp. 43-44.   SA Wittman did not explicitly threaten defendant or make any explicit promises regarding criminal penalties or favorable prosecutorial treatment.

At approximately 38 minutes into the interview, defendant can be heard recounting how his daughter's mother would take him home from parties "back in 2005."   Suppression Hearing Ex. 1. at 37:00-38:30; Docket 31-1 at pp. 19-21. At approximately minute 37:53, defendant states, "But I just don't know how I could have done it.   My daughter's mom would take me, take me back home. Sir, I'm just having a hard time."   Id. at 37:47.   During the post-polygraph examination, defendant asked to use the restroom and was escorted there by SA

---

[6]The parties jointly submitted Exhibit 1, which is a disc containing an audio recording of defendant's post-polygraph interrogation.   (Docket 55 at p. 94).   The R&R refers to this exhibit as Exhibit 102 because the disc, provided by the defense, was so marked; however, it was received into evidence as Exhibit 1.

Thatcher and SA Wittman. (Docket 55 at pp. 24, 76). Defendant returned to the interview with no escort. Id. at p. 25.

Approximately one hour and 44 minutes into the interrogation, SA Wittman turned away from defendant and began preparing for his next scheduled polygraph. Id. at p. 82. At this point, defendant stated, "Yeah, that's the only time, I think," referring to sexual contact with T.T. Suppression Hearing Ex. 1. at 1:45:00; Docket 31-1 at p. 50. Following this statement, defendant proceeded to explain how, at a party in approximately 2005, he returned from the restroom with his zipper undone, grabbed T.T.'s hand and placed it on his penis. (Docket 31-1 at pp. 50-52). He denied engaging in vaginal intercourse with T.T., telling SA Wittman, "That's it, that's all out there. It's just one time, that was the one-time-thing, like you said." Id. at pp. 54-55. SA Thatcher entered the interview room after this statement and SA Wittman asked defendant to repeat his account of the sexual contact to SA Thatcher. Id. at p. 55. Defendant responded, to SA Wittman, "Just tell me back what you remember." Id. SA Wittman recounted defendant's story to SA Thatcher to which defendant stated, "Yes, because I thought it was a different girl, until I seen her face." Id. at p. 56.

After the end of the post-polygraph interrogation, SA Thatcher agreed to take defendant back to his sister's house in Oglala. (Docket 55 at pp. 28-29). Defendant had been looking for alternative rides home—SA Thatcher observed him using his cell phone after the interview ended—but he was unsuccessful. Id. Defendant asked to stop to pick up food and SA Thatcher took him to Big

Bat's, a convenience store in Pine Ridge.  Id. at pp. 29-30.  Defendant paid for his food using EBT.  Id. at p. 146.  He had no cash that day.  Id.

On the drive back to Oglala, SA Thatcher interrogated defendant.  Id. at pp. 30-31.  He recorded the conversation, which was admitted into evidence as Exhibit 103.  Id. at pp. 30-31, 35-36.  During the interview, defendant again stated he grabbed T.T.'s hand and put it on his penis.  (Docket 31-2 at p. 4).  Defendant also admitted there was "a possibility . . . [he] put [his] penis in her vagina," referring to T.T.  Id. at p. 16.  However, he did not affirmatively confess to having vaginal sex with T.T.—he repeatedly stated he did not remember.  See, e.g., id. at p. 21.  The in-vehicle interview lasted approximately 34 minutes.  Suppression Hearing Ex. 103.  SA Thatcher returned defendant to his sister's house around 3 p.m.  (Docket 57 at p. 7).  The polygraph and interrogation process lasted approximately five to six hours.  Id.

Defendant testified at the suppression hearing.  (Docket 55 at pp. 106-63).  As of the hearing, defendant was 52 years old.  Id. at p. 106.  He would have been 51 years old during the July 2017 polygraph and interrogation.  Id.  Defendant has a state and tribal criminal history with at least 22 separate arrests.  Id. at pp. 137-38.  He served in the military and testified to having experience with military police.  Id. at p. 145.  He agreed with the prosecutor's statement, "it was no surprise to you when you had conversations with law enforcement[.]"  Id. at pp. 145-46.  Defendant has a high school diploma and attended "[a] few" college classes.  Id. at p. 157.

Defendant felt "uncomfortable" during the polygraph examination because SA Wittman touched his hand and arm at times.   Id. at p. 150.   He felt the physical distance between the two of them during the interview was "weird" and that SA Wittman was staring at him.   Id. at p. 131.   Defendant believed he could not leave the interview because he didn't have his cell phone and his only ride home was with SA Thatcher.   Id. at p. 134.   He testified he confessed to sexual contact with T.T. to end the questioning and get home.   Id. at p. 137.   He was concerned about his daughter.   Id. at pp. 160.   However, defendant also testified SA Wittman did not threaten him, yell at him or make him any promises regarding criminal charges.   Id. at pp. 151-52.   The polygraph questions were not a surprise to defendant.   Id. at p. 153.   Defendant knew he could have left the interview at any time, but he worried about leaving his phone.   Id. at p. 156.   He understood the questions he was asked by both agents and spoke with them voluntarily.   Id. at pp. 160-61.   Neither the government nor the defense introduced any evidence tending to show defendant has any mental incapacities.

## II.     Defendant's Objections to the R&R

Defendant objected to 11 portions of the R&R.   (Docket 60).   As summarized by the court, these objections relate to:

1.     The finding SA Thatcher's testimony is credible.   Id. at p. 2.

2.     The finding SA Thatcher told defendant it was his decision to take the polygraph and that he did not have to take it.   Id.

3.     The finding defendant conferred with his mother at his sister's home in Oglala before deciding to take the polygraph test.   Id.

4.     The finding SA Wittman's testimony is credible.   Id.

5.   The finding SA Wittman told defendant the polygraph results indicated deception.   <u>Id.</u>

6.   The finding defendant repeated his confession regarding sexual contact with T.T. to SA Thatcher.   <u>Id.</u> at pp. 2-3.

7.   The findings SA Wittman never told defendant he could be charged with a crime and never made any promises or threats to defendant.   <u>Id.</u> at p. 3

8.   The lack of discussion in the R&R regarding SA Wittman's " 'one-time-thing' interrogation technique."   <u>Id.</u> at pp. 3-4.

9.   The finding the agents did not act coercively.   <u>Id.</u> at p. 4.

10.   The finding defendant was free to leave the interview.   <u>Id.</u>

11.   The finding defendant's personal characteristics did not make him "particularly vulnerable" to the agent's interrogation.   <u>Id.</u>

The court will address each objection in turn.

## III.   Discussion

### A.   Legal standard

"Fundamental to our system of justice is the principle that a person's rights are violated if police coerce an involuntary confession from him, truthful or otherwise, through physical or psychological methods designed to overbear his will."   <u>Wilson v. Lawrence Cty.</u>, 260 F.3d 946, 952 (8th Cir. 2001).   A defendant's statement to law enforcement is "involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." <u>Simmers v. Bowersox</u>, 235 F.3d 1124, 1132 (8th Cir. 2001).

> Whether a confession is involuntary is judged by the totality of the circumstances. . . . The court must look at the "conduct of the officers and the characteristics of the accused." . . . The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary.

11

United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (quoting Wilson, 260 F.3d at 952). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986).

> [O]fficers elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices. None of these tactics render a confession involuntary, however, unless the overall impact of the interrogation caused the defendant's will to be overborne.

United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005) (internal quotations and citations omitted).

Some "of the key concerns in judging whether confessions [are] involuntary . . . [are] the intelligence, mental state, or any other factors possessed by the defendant that might make him particularly suggestible, and susceptible to having his will overborne." Wilson, 260 F.3d at 952. The United States Court of Appeals for the Eighth Circuit has "[g]enerally . . . concluded that where the defendant possessed at least average intelligence, then his inculpatory statements were not compelled." LeBrun, 363 F.3d at 726.

### B. Factual objections

Defendant's first seven objections relate to the magistrate judge's factual findings. The court rejects six of defendant's seven factual objections and sustains part of defendant's seventh objection. With the small modification

discussed below, see infra Section III.B.4, the court adopts the R&R's factual findings as a supplement to the court's own findings. See Docket 57 at pp. 2-7.

### 1. First and fourth objections

Defendant's first and fourth objections concern the credibility of SA Thatcher and SA Wittman. Like the magistrate judge, the court finds both SA Thatcher and SA Wittman to be credible witnesses. In undertaking its *de novo* review of the transcript of the evidentiary hearing and the testimony presented, as well as the transcripts and recordings of the agents' interrogations of defendant, the court found both the agents' testimony to be consistent with the recorded evidence. The court identified few inconsistences in the agents' testimony, none of which concerned issues material to defendant's suppression motion. Defendant gives the court no reason to doubt the agents' credibility; his objections are curt and undeveloped. The court overrules defendant's first and fourth objections. (Docket 60 at p. 2).

### 2. Second and third objections

In his second objection, defendant contends SA Thatcher not only did not tell him he didn't have to take the polygraph test, but also he "insisted" defendant had to take the test. Id. His third objection further asserts his mother was not present at his sister's home when he left with SA Thatcher to take the polygraph test. Id.

Defendant's second objection is contradicted by the record. SA Thatcher testified he informed defendant a polygraph test was an option—not a requirement—at their March 2016, June 2017 and July 2017 meetings.

13

(Docket 55 at pp. 10-11, 14-15). SA Thatcher specifically told defendant the polygraph test was voluntary at each of their meetings. Id. at p. 15. Defendant signed a consent form stating the polygraph test was voluntary. Suppression Hearing Ex. 3. Finally, defendant stated he took the polygraph test voluntarily because he thought he could pass it. (Docket 55 at p. 145). The court concludes SA Thatcher did not insist defendant had to take the polygraph test and that he informed defendant the test was voluntary at each of their meetings. Defendant's second objection is overruled.

Defendant's third objection is also without foundation. SA Thatcher, a witness the court finds credible, specifically testified to observing defendant's sister and mother at the home in the Belt Village neighborhood of Oglala. Id. at p. 16. Defendant testified his mother lived only about a mile away from his sister's home and she frequently visited his sister. Id. at p. 111. The court finds defendant's mother was present at the home when SA Thatcher picked him up. Defendant's third objection is overruled.

### 3. Fifth and sixth objections

Defendant's fifth objection argues SA Wittman did not inform defendant the test results indicated deception. In defendant's view, SA Wittman instead told defendant the results showed he committed the alleged crimes. (Docket 60 at p. 2). His sixth objection contends he did not repeat his confession to SA Thatcher, but he instead asked SA Wittman to repeat his confession. Id. at pp. 2-3.

Defendant's fifth objection is a semantic disagreement at best. The magistrate judge's phrasing of this factual finding encompasses the language SA Wittman is recorded using to defendant. The magistrate judge stated, "After finishing the polygraph test, SA Wittman informed Mr. Blacksmith that the results indicated deception[.]" (Docket 57 at p. 5). SA Wittman's first statement in the recorded post-polygraph interrogation was "Grant, look, going through there, it's clear that you did in fact have sexual contact with [T.T.], that your penis did touch her, and it's clear that that's what happened[.]" (Docket 31-1 at p. 1). This statement by SA Wittman informs defendant the test showed deception. Furthermore, defendant himself testified SA Wittman told him the test "indicated [he] lied on one of the questions." (Docket 55 at p. 132). He clearly understood SA Wittman's statement to indicate the test showed deception. Defendant's fifth objection is overruled.

Defendant's sixth objection is flatly contradicted by the record. Defendant did ask SA Wittman to repeat his confession to SA Thatcher, but he promptly agreed to SA Wittman's summary when asked to confirm. The colloquy reads:

SA Wittman:     "[R]ight, and you put her hand on your penis.

Defendant:      "Yes, because I thought it was a different girl, until I seen her face."

(Docket 31-1 at p. 56). Defendant later repeated his confession to SA Thatcher during the ride from Pine Ridge to Oglala. (Docket 31-2 at p. 4). Defendant's sixth objection is overruled.

### 4.    Seventh objection

Defendant's seventh object contends SA Wittman made implied promises and threats to defendant during the post-polygraph interrogation in contradiction to the magistrate judge's finding that SA Wittman made no promises or threats of any type.   (Docket 60 at p. 3).   The court partially agrees with defendant's characterization of SA Wittman's questioning techniques.

Defendant points to two of SA Wittman's statements.   First, he highlights this statement:

> I'd like to go back out to the investigators and tell them that, hey, yeah, he did this but there aren't other kids out there, it's just the one time, he's not proud of it, he made a mistake, and in fact it probably never would have happened if it weren't for the alcohol.

(Docket 31-1 at p. 12).   He next identifies this statement:

> There's something you do remember and it's bothering you and you need to get that out before it's too late because all this keeps going, whether you are on the train or not, everything, the investigators are going to keep working, keep investigating, keep talking, and at some point you won't be able to say it was a one-time mistake anymore because people aren't going to believe you because you lied so long about it.   So, this is your chance, it's a very limited chance to get your point of view out there that, hey, I only did this once.

Id. at p. 49.   Defendant argues these are examples of implied promises and threats.   (Docket 60 at p. 3).

The court rejects defendant's attempt to characterize the first statement as an implied promise.   The statement is a rhetorical device at most.   It seeks to convince the defendant of SA Wittman's willingness to believe his actions were mistaken or attributable to drunkenness.   The court does not believe the statement can be fairly read to imply SA Wittman is willing to convince other

investigators to stop their investigation of defendant in exchange for a confession.

On the other hand, the second statement defendant identifies can fairly be read as an implied threat. SA Wittman was seeking to elicit a confession by impliedly threatening defendant he would have no future opportunities to "get [his] point of view out there[.]" (Docket 31-1 at p. 49). However, the court rejects any implication in defendant's argument this implied threat was sufficient to overwhelm defendant's will such that his confessions were rendered involuntary. Defendant himself did not view SA Wittman's statement as a threat. (Docket 55 at p. 151). As discussed below, the court concludes the agents did not coerce defendant into confessing. See infra Section III.C.1.

The court sustains defendant's seventh objection in part and overrules it in part. (Docket 60 at p. 3). The R&R is modified to remove the magistrate judge's statement that SA Wittman made no threats.

### C. Legal objections

Defendant's eighth through eleventh objections argue against the magistrate judge's legal conclusions. The court rejects each of these objections and adopts the R&R on these points.

### 1. Eighth and ninth objections

Defendant's eighth and ninth objections relate to SA Wittman's use of a "minimizing" or "one-time-thing" interrogation technique. (Docket 60 at pp. 3-4). Defendant's eighth objection concerns the magistrate judge's failure to specifically discuss this interrogation technique. Id. at p. 3. His ninth

objection relates to the magistrate judge's conclusion the agents did not act coercively.[7]  Id. at p. 4.   Defendant specifically contends SA Wittman's "unrelenting use of the intentionally coercive" minimization technique overbore his will.   Id.

Defendant does not define or describe what he means by the minimization technique.   In his suppression motion briefing, he merely provides a string citation to portions of the interrogation transcripts.   (Docket 31 at pp. 10-11). The court gathers defendant refers to SA Wittman's statements like the following:

> If that's all we are dealing with, is a one-time situation where you feel bad about it, things got out of control, you talk about it, then we can move on and you can accept who you are as a sober person, making the right decisions, doing the things that would make your father proud, right, which is acknowledging mistakes, making yourself a better person and moving forward, all right, instead of putting blame on others, lying about everything you do, people will think the worst, if it's not a one-time mistake, then it must be that he's doing this all the time, that he's interested in sex with kids, and we know that's not the truth, it's just a one-time mistake, all right?   It's just a one-time mistake.

(Docket 31-1 at p. 4).   In this statement, SA Wittman may have meant to lull defendant into confessing by implying his conduct was minimal or inoffensive in comparison to other behavior.   Defendant fails to explain how this interrogation technique overwhelmed his will.   He identifies no authorities holding minimization is coercive or even discussing it as a known interrogation tactic. In the court's view, the minimization technique used by SA Wittman in the

---

[7]Defendant's ninth objection is phrased generally, but he later narrows his objection to SA Wittman's use of the minimization technique.   Given his specific focus, the court concludes defendant is not objecting to any other interrogation techniques used by either agent, or to any of SA Thatcher's interrogation tactics. In any case, the court discerns no coercion in either agent's interrogation.

recorded post-polygraph interrogation is not *per se* coercive.  At best, SA

Wittman's statements could be described as "playing on [defendant's] emotions"

or deceiving him—tactics the Eighth Circuit specifically approved unless they

overwhelm a defendant's will.  Brave Heart, 397 F.3d at 1041.  Defendant gives

the court no reason to believe the minimization tactic overwhelmed his will.

The court overrules defendant's eighth and ninth objections.  The

magistrate judge did not err in declining to specifically analyze whether SA

Wittman's use of the minimization tactic overwhelmed defendant's will.  The

court finds SA Wittman did not act coercively during defendant's interrogation.

The court adopts the R&R on these points.

### 2.    Tenth objection

Defendant's tenth objection concerns the magistrate judge's finding he

could have removed himself from the interrogation.  (Docket 60 at p. 4).

Defendant argues he was unable to leave the interrogation because his only way

home was a ride from the agents.  Id.  In his view, the magistrate judge erred by

giving no weight to his lack of transportation.  Id.  The court disagrees.

Defendant was specifically told, in person and in writing, he had the right

to terminate the interrogation and leave at any time.  Docket 55 at p. 69;

Suppression Hearing Exs. 2 & 3.  He never attempted to leave the DSS building,

nor did he ever ask the agents to terminate the interrogation and take him back

to Oglala.[8]   Defendant's argument that his ability to leave the interrogation was constrained by his dependence on the agents for transportation would be significantly bolstered by evidence they denied him a ride.   The record shows the opposite.   When defendant finally did ask for a ride after the post-polygraph interrogation ended, SA Thatcher readily agreed.   (Docket 55 at pp. 28-29). The court cannot conclude defendant was unable to leave the interrogation when the available evidence suggests the agents would have offered him a ride home had he asked.

Furthermore, defendant's ability to leave the interrogation is not solely measured by whether the agents were willing to give him a ride.   Defendant testified he could have left the DSS building and walked to a nearby convenience store.   (Docket 55 at p.p. 146-47).   He had friends in Pine Ridge he could have contacted for a ride.   Id. at p. 147.   Presumably, defendant could also have contacted his family members in Oglala for transportation.[9]   Defendant even testified he had hitchhiked in the past.   Id. at p. 157.

---

[8]In his suppression motion briefing, defendant asserted he did indeed ask SA Wittman to take him home.   (Docket 31 at p. 7).   The magistrate judge disagreed; in listening to the recording of the post-polygraph interrogation, she found defendant was not asking for a ride home but was describing leaving parties in the early 2000s.   (Docket 57 at p 12 n.2).   The court also listened to the recording of the interrogation and agrees with the magistrate judge.   The court's factual finding regarding this conversation is set forth above.   See supra Section I at p. 7.   Defendant did not ask SA Wittman for a ride home.

[9]To the extent defendant might argue he was unable to contact family or friends without access to his cell phone, the court notes he never asked the agents to return his phone, if indeed they asked him to leave it outside the examination room.   There is no evidence the agents held defendant's phone against his will.

The court, like the magistrate judge, finds defendant could have ended the interrogation and left the DSS building at any point. Defendant's tenth objection is overruled. The court adopts the R&R on this issue.

### 3. Eleventh objection

Defendant's final objection is to the magistrate judge's conclusion his personal characteristics did not render him particularly vulnerable to coercion. (Docket 60 at p. 4). He argues the magistrate judge erred by giving "no weight to the likelihood [he] falsely confessed to end the interrogation" and return home to care for his daughter. Id. The court rejects this argument.

Defendant testified his sister was watching his daughter and his niece's husband was scheduled to return home shortly after 11 a.m. on the day of the polygraph test. (Docket 55 at pp. 115-17). Furthermore, the court previously found defendant's mother was in his sister's home that day as well. See supra Section III.B.2. It appears defendant's niece's two children may also have been in the home. Id. at pp. 113-14. It seems likely one of these three adults were in the home throughout the day caring for defendant's daughter and, potentially, the other two children. Defendant told SA Wittman his daughter was being cared for. Id. at p. 71. He never expressed worry about his daughter to the agents, asked to contact his sister or other family members to inquire about her, or asked to be taken home to care for her.

Given these circumstances, the court cannot say defendant's daughter was left alone during his interrogation such that he can now claim his will was overwhelmed by parental concern. In fact, defendant was apparently not

unduly concerned about childcare on the day of the polygraph test; not only did he willingly agree to leave home to take the test in the first place, he also told SA Wittman his daughter was being cared for.   Additionally, defendant does not explain why he would falsely confess to a serious crime out of fear for his daughter's well-being after being informed multiple times he could end the interrogation and leave at any time.   The court concludes the magistrate judge did not err in concluding defendant's potential worries about childcare did not make him especially vulnerable to coercion.   The court overrules defendant's eleventh objection and affirms the R&R on this issue.

## IV.   Conclusion

With the minor modification discussed above regarding SA Wittman's implied threats to defendant during the post-polygraph interrogation session, see supra Section III.B.4, the court adopts the R&R.   Defendant's objections are sustained in part and overruled in part.   The court finds defendant's incriminating statements to SA Wittman and SA Thatcher following the polygraph examination on July 10, 2017 were voluntary.   Accordingly, defendant's motion to suppress is denied.

## ORDER

For the reasons given above, it is

ORDERED that defendant's objections to the magistrate judge's report and recommendation (Docket 60) are sustained in part and denied in part.

IT IS FURTHER ORDERED that the report and recommendation (Docket 57) is adopted as modified by this order.

IT IS FURTHER ORDERED that defendant's suppression motion (Docket 30) is denied.

IT IS FURTHER ORDERED that a scheduling order will follow.

Dated February 11, 2019.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE